

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

**NO. 2-08-446-CV**

ERIC COX                                                                    APPELLANT

V.

WASTE MANAGEMENT OF                                          APPELLEES
TEXAS, INC. AND TONY WADLEY

------------

FROM THE 153RD DISTRICT COURT OF TARRANT COUNTY

------------

## OPINION

------------

**Introduction**

In nine issues, appellant Eric Cox appeals the trial court's orders granting the separate summary judgment motions of appellees Waste Management of Texas, Inc. (Waste Management) and Tony Wadley.  We affirm.

**Background Facts**

Waste Management hired Cox as a waste truck driver in July 2004. Wadley, a route manager, was Cox's immediate supervisor, and Wadley and Cox became friends. During that friendship, Cox often called Wadley on Wadley's business cell phone to discuss both personal and work-related matters. In the latter part of 2005, however, Wadley began aggressively seeking a closer relationship with Cox that Cox believed to be romantic and sexual in nature.

For example, according to Cox, Wadley began asking Cox to stay with him on weekends, come over to his house to watch movies, and go on fishing trips with him. He constantly asked Cox, "When are you going to give me some time?" He told Cox that he and Waste Management would take care of Cox and his family. Wadley sent Cox text messages saying things such as "Do u know who loves u," "Just know who loves you," and "I will always be here for you Eric."

Cox said that "for a long time [he] thought [Wadley] was just being friendly and then it got worse and worse until [Cox] had enough." Wadley never tried to kiss Cox or touch him inappropriately, and he never directly told Cox that he had any sexual intentions, but Cox inferred from

2

Wadley's statements and actions that Wadley wanted to have a romantic relationship.[1]

Cox did not return interest in such an apparently romantic relationship, and he told Wadley to stop making such communications. When Cox told Wadley that he was happy with his current relationship situation, Wadley told Cox that such a statement made him angry and made him want to hurt Cox. Cox told Wadley to leave him alone and that he would transfer his work location to avoid Wadley, but Wadley told Cox three or four times that he would find Cox regardless of where Cox went. When Cox complained to Wadley about the communications, Wadley would "stop for a little bit and then he would start back up."

On January 2, 2006, Cox finally determined that he was being sexually harassed when he got a text message from Wadley in which Wadley told Cox that he loved him.[2] Cox became angry and called Charles ("Moose") Tyler, Wadley's supervisor, to express Cox's fear about Wadley's behavior. According to Tyler, Cox was vague during the call about the nature of his complaint and said that he "didn't want to get anybody in trouble," but Tyler

---

[1] Wadley has offered nonromantic, nonsexual explanations for some of his statements to Cox.

[2] Cox said that he did not feel harassed until the "very end" because it was "really hard to decide" when Wadley "went too far."

was still concerned, and he believed that Cox's complaints should be investigated.

The next day, Cox felt too much fear to return to work, so upon his own suggestion, he met Tyler and Albert Godoy, Waste Management's human resources manager for the northern Texas area and its primary sexual harassment investigator, for about forty-five minutes at an IHOP restaurant. During that meeting, Godoy took notes as Cox told them that Wadley was "real persistent" and that he "wouldn't leave [Cox] alone." Cox also showed them the text messages that Wadley had sent to Cox's phone and wrote a complaint about Wadley's behavior. The parties dispute whether Cox displayed text messages that he had sent to Wadley.

Although Godoy wrote down the text messages that Cox had displayed, Cox did not believe that Tyler and Godoy took his complaints seriously. Godoy asked Cox what remedy Cox wanted regarding Wadley's conduct, and Cox allegedly "refused to offer any suggestions." Tyler thought that the text messages that Cox had showed him were inappropriate and that they potentially had a romantic tone.

After Tyler and Godoy's meeting with Cox at the IHOP, they went to talk to Houston Chambliss, a Waste Management district manager (and Tyler's supervisor), about Cox's complaints and his desire to have all communication

4

from Wadley stopped. Chambliss was shocked about the messages that Wadley had sent to Cox. Chambliss and Godoy then met with Wadley to discuss Cox's allegations. Chambliss says that Wadley claimed that he was trying to be a "big brother" to Cox and also claimed that Cox had previously made sexual gestures to him. Because Cox was allegedly "vague about his complaints" and because Wadley told Godoy that Wadley's text messages to Cox were a result of ongoing communication between them, Godoy formed an initial opinion that the conduct between Wadley and Cox could have been consensual.

On the same day that he met with Wadley individually, Chambliss arranged for Cox to participate in a joint meeting with Wadley, although according to Cox, Cox told them that he did not want to see Wadley because he was uncomfortable around him and feared "what [Wadley] might do."[3] Wadley, Cox, Tyler, Godoy, and Chambliss participated in that thirty-minute meeting. Godoy thought that the joint meeting was the "best way [to] find out the facts."

During the joint meeting, Chambliss says that Cox only would repeat that he, Cox, was "F'd up" or say something like, "Come on, Tony. Tell the truth."

---

[3] Chambliss says that Cox agreed to the joint meeting.

5

Wadley allegedly apologized and said that he was trying to be a father figure to Cox and that he thought Cox was gay.[4]  Cox believes that the Waste Management officials sided with Wadley during the meeting.  Godoy says that the joint meeting made Cox's allegations "cloudier" and that the individuals at the meeting did not clarify any specific facts.

After the joint meeting, Cox made about twenty calls to various mental health offices.  Godoy referred Cox to Waste Management's employee assistance program, and Waste Management allowed Cox to take paid short-term disability leave starting in January 2006.  Cox saw a psychiatrist for his mental health related to Wadley's alleged sexual harassment and took some prescription medicine for his depression, anxiety, and sleeplessness.

In the middle of January, Waste Management suspended Wadley for two weeks without pay because the company believed that Wadley "exercised poor judgment in becoming too close to a subordinate."  Waste Management also gave a written reprimand to Wadley and placed the reprimand in his employment file.  The reprimand notified Wadley that his text messages to Cox "created a perception of harassment . . ., which is a violation of the Company's Harassment Policy."  Even after his suspension ended, Wadley only appeared

---

[4] Wadley, who admitted in his deposition that he is homosexual, says that he was embarrassed and humiliated by the meeting with Cox.

6

at work for Waste Management between two days to two weeks until he voluntarily resigned his employment on May 18, 2006. Wadley never contacted Cox again after the meeting on January 3, 2006.

Despite suspending Wadley, Waste Management did not conclude that actual sexual harassment had occurred. And Godoy did not report to Cox the result of Godoy's investigation or the disciplinary action against Wadley because Cox never returned to work.

Godoy called Cox at some point during Cox's leave to ask whether Cox wanted to return to work. Godoy says that he told Cox that if Cox wanted to return to work, there were "various options open to him" and that he "guarantee[d] [Cox] that he would not be around [Wadley]." But Cox says that the only thing Waste Management offered him at that time was a transfer to its Lewisville office. He does not acknowledge that Waste Management also offered to transfer Wadley. After speaking with Cox, Godoy received a call from Cox's mental health provider informing him "not to pressure [Cox] to return to work."

Godoy did not make any official written report about Cox's allegations, although he testified that he constantly communicated with his supervisors about the allegations and his own investigation. Godoy said that he concluded his investigation by taking corrective action against Wadley and by offering Cox

7

"whatever position he would possibly want to work or whatever location he would possibly want to work." But he also said that he left the investigation open to the extent that if more information became available, further action against Wadley could have been taken. He explained that he did not conclude that Cox had been sexually harassed because his relationship with Wadley "was one apparently where there was quite a bit of [communication] outside of work hours," so he believed the relationship to be consensual.[5] Cox is the only employee to have complained about Wadley.

Cox's counsel, Susan Hutchison, sent Godoy a letter on May 1, 2006, stating that Cox considered himself constructively discharged from employment because Waste Management gave an "ineffective, inappropriate, retaliatory[,] and terrible response" to Cox's harassment allegation and no "reasonable person would remain employed" under those conditions. Waste Management's counsel, Janne Foster, responded to Hutchison's letter on May 5, 2006. Foster's letter recited that Waste Management had previously offered to allow Cox to transfer from the Fort Worth Waste Management district to another

---

[5] Chambliss also did not conclude that Cox had been sexually harassed because of Cox's ongoing communication with Wadley; he characterized Cox's complaint as harassment, but not sexual harassment. However, he admitted that Wadley still "did not perform as a manager accordingly." Tyler, on the other hand, concluded that Wadley had sexually harassed Cox based on the text messages Wadley and Cox exchanged.

district or remain in the Fort Worth district, in which case Waste Management would remove Wadley from that district. In either case, Foster's letter assured Cox that he "would not be required to work with [Wadley]." The letter stated, "These options remain available . . . . Naturally he is free to resign if he wishes, but he should clearly understand the options available to him."[6] On May 9, 2006, Hutchison sent another letter to Foster that reiterated Hutchison's belief that Cox had been constructively discharged, stating, "Mr. Cox is unable to return to work at Waste Management and will not do so. What you have stated in your letter is the epitome of 'too little, too late.'"

Wadley voluntarily resigned from Waste Management's employment on May 18, 2006, more than four months after Cox's initial complaint. Cox's employment with Waste Management officially ended on May 19, 2006.[7]

---

[6] During his deposition, Chambliss testified, "[W]e were going to do everything we could to accommodate [Cox] making a smooth transition back into the day-to-day routine of the rank and file of the drivers and such."

[7] Foster's letter to Hutchison, sent on May 5, 2006, concluded by stating,

> I understand from your letter that Mr. Cox does not want to remain employed by Waste Management any longer. He, therefore, will be removed from payroll effective May 19, 2006, as a voluntary resignation—failure to return from leave. If I am incorrect and Mr. Cox does not wish to resign, please let me know immediately.

Cox did not express any desire to not resign, so Waste Management removed him from its payroll on May 19, 2006.

Cox sued appellees on November 20, 2006, and in March 2007, Cox filed his amended petition. The petition contained causes of action against Waste Management under the labor code and separate claims for intentional infliction of emotional distress (IIED) and negligent retention or supervision of Wadley. The petition also included a common law assault claim against Wadley and an allegation that Waste Management should be vicariously liable for the assault.

In September 2008, Wadley and Waste Management filed separate motions for summary judgment. Cox responded to both motions, and after Waste Management replied to Cox's response, the trial court granted both motions. Cox filed his notice of this appeal.

**Standards of Review**

**Traditional summary judgment standard**

In a summary judgment case, the issue on appeal is whether the movant met the summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Sw. Elec. Power Co. v. Grant,* 73 S.W.3d 211, 215 (Tex. 2002); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979). The burden of proof is on the movant, and all doubts about the existence of a genuine issue of material fact are resolved against the movant. *Sw. Elec. Power Co.,* 73 S.W.3d at 215. Evidence that favors the

10

movant's position will not be considered unless it is uncontroverted. *Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.*, 391 S.W.2d 41, 47 (Tex. 1965).

A defendant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim. *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004); *see* Tex. R. Civ. P. 166a(b), (c). A defendant is entitled to summary judgment on an affirmative defense if the defendant conclusively proves all the elements of the affirmative defense. *Rhone-Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999); *see* Tex. R. Civ. P. 166a(b), (c). To accomplish this, the defendant-movant must present summary judgment evidence that establishes each element of the affirmative defense as a matter of law. *Ryland Group, Inc. v. Hood*, 924 S.W.2d 120, 121 (Tex. 1996).

**No-evidence summary judgment standard**

After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that there is no evidence to support an essential element of the nonmovant's claim or defense. Tex. R. Civ. P. 166a(i). The motion must specifically state the elements for which there is no evidence. *Id.*; *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 207 (Tex. 2002). The trial court

11

must grant the motion unless the nonmovant produces summary judgment evidence that raises a genuine issue of material fact. *See* Tex. R. Civ. P. 166a(i); *Sw. Elec. Power Co.*, 73 S.W.3d at 215.

When reviewing a no-evidence summary judgment, we examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006). If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary judgment is not proper. *Moore v. K Mart Corp.*, 981 S.W.2d 266, 269 (Tex. App.—San Antonio 1998, pet. denied). We review a no-evidence summary judgment for evidence that would enable reasonable and fair-minded jurors to differ in their conclusions. *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005)).

**Sexual Harassment Claims**

Waste Management filed a traditional summary judgment motion on Cox's claims under the labor code. In Cox's first four issues, he argues that the trial court improperly granted judgment to Waste Management on the claims because (1) there are material fact issues regarding whether Cox was sexually harassed by Wadley, (2) Waste Management did not prove its affirmative

12

defense to show that it exercised reasonable care to prevent and correct sexual harassment and to show that Cox unreasonably failed to take advantage of preventative or corrective opportunities, (3) there are material fact issues about whether Waste Management retaliated against Cox, and (4) there are material fact issues concerning whether Cox was constructively discharged.[8] Cox sued Waste Management for sexual harassment under chapter twenty-one of the labor code.

Section 21.051(1) of the labor code states in relevant part, "An employer commits an unlawful employment practice if because of . . . sex, . . . the employer . . . discriminates in any . . . manner against an individual in connection with compensation or the terms, conditions, or privileges of employment."   Tex. Lab. Code Ann. § 21.051(1) (Vernon 2006). Sexual harassment, including same-sex harassment, is one form of discrimination prohibited under the labor code.  *See Hoffmann-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 445 (Tex. 2004); *City of San Antonio v. Cancel*, 261 S.W.3d 778, 783 (Tex. App.—Amarillo 2008, pet. denied) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80–81, 118 S. Ct. 998, 1002–03 (1998)).

---

[8] Cox lists these issues separately on the first page of his brief, but he argues them together, and we will consider them together.

13

In the summary judgment proceedings at trial and in their briefing on appeal, the parties have characterized Cox's labor code claims as "quid pro quo" harassment, "hostile work environment" harassment, and retaliation. *See Zeltwanger*, 144 S.W.3d at 445 n.5 (recognizing these forms of sexual harassment); *Garcia v. Schwab*, 967 S.W.2d 883, 885 (Tex. App.—Corpus Christi 1998, no pet.) (same). The parties agree and we conclude that although Cox filed his sexual harassment claims under the labor code, we may use federal authority related to Title VII of the Civil Rights Act to determine the validity of the claims. *See* 42 U.S.C. §§ 2000e, 2000e-2 (2003); Tex. Lab. Code Ann. § 21.001(1) (Vernon 2006); *Ysleta ISD. v. Monarrez*, 177 S.W.3d 915, 917 (Tex. 2005); *Niu v. Revcor Molded Prods. Co.*, 206 S.W.3d 723, 728 (Tex. App.—Fort Worth 2006, no pet.).

**Quid pro quo harassment**

Waste Management argued in its motion that it is entitled to summary judgment on Cox's quid pro quo sexual harassment claims because the evidence negates any tangible employment action that resulted from Cox's acceptance or rejection of Wadley's alleged unwelcome sexual harassment. *See La Day v. Catalyst Tech., Inc.*, 302 F.3d 474, 481 (5th Cir. 2002); *Wal-Mart Stores, Inc. v. Itz*, 21 S.W.3d 456, 470 (Tex. App.—Austin 2000, pet. denied) ("The elements of the cause of action are as follows: (1) A

supervisor (2) because of sex (3) subjects an employee to (4) unwelcome conduct that (5) affects a tangible aspect of the employment relationship."). A tangible employment action is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. *La Day*, 302 F.3d at 481–82; *see Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761–62, 765, 118 S. Ct. 2257, 2268–70 (1998).

Cox first contends that he suffered a tangible employment action because Waste Management allegedly initially offered him only a transfer to Waste Management's Lewisville office in response to his sexual harassment complaint.[9] However, assuming as we must for summary judgment purposes that Cox's testimony about the initial Lewisville transfer offer is true (and that Waste Management did not instead also offer to transfer Wadley initially), Cox did not suffer any tangible employment action based on that offer.[10] Courts have held that a transfer in a plaintiff's job location, when the transfer

---

[9] He testified in a deposition, "[T]he only thing [Waste Management] offered me was going to Lewisville. That was that simple. It was black and white to where that was it. Because you need to go to Lewisville. This is the thing for you."

[10] Without citing authority, Cox argues in his brief that a "transfer in direct response to a complaint of sexual harassment falls within the definition of [a] 'tangible employment action.'"

15

is unaccompanied by any change in salary, benefits, job responsibilities, or career opportunities, is insufficient as a matter of law to comprise a tangible employment action. *See Harper v. City of Jackson Mun. Sch. Dist.*, 149 Fed. Appx. 295, 299 (5th Cir. 2005); *Padilla v. Flying J, Inc.*, 119 S.W.3d 911, 915–16 (Tex. App.—Dallas 2003, no pet.) (holding that a transfer that does not result in economic harm or significantly different job responsibilities is not a tangible employment action); *see also Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1300 (11th Cir.) (stating that "[p]roviding an employee with a choice about where she works does not change the terms or conditions of her employment"), *cert. denied*, 128 S. Ct. 499 (2007); *cf. Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 744 (7th Cir. 2002) (collecting cases from various federal appeals courts and explaining that when a lateral transfer "significantly reduces the employee's career prospects by preventing him from using the skills in which he is trained and experienced," a tangible employment action may exist), *cert. denied*, 540 U.S. 984 (2003). Cox has argued that his offered transfer to the Lewisville office comprises a tangible employment action because it would have increased his commuting time, but he has not directed us to anything in the record to support that assertion (such as evidence

demonstrating the relative distance from his residence to the Fort Worth office as opposed to the Lewisville office), and we have not found such evidence.[11]

Also, even if Waste Management's initial offer to transfer Cox could have been a tangible employment action, the undisputed evidence shows that Waste Management later offered to transfer Wadley and keep Cox in the Fort Worth location while Cox was still on Waste Management's payroll. Thus, Cox could have avoided any alleged significant change of his employment conditions that would have been caused by the transfer. *See La Day*, 302 F.3d at 481–82; *see also Pa. State Police v. Suders*, 542 U.S. 129, 146, 124 S. Ct. 2342, 2354 (2004) (explaining that a plaintiff in a sexual harassment case must make reasonable attempts to "stave off avoidable harm").

Next, Cox contends that he suffered a tangible employment action because he was constructively discharged. A constructive discharge may qualify as a tangible employment action. *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 480 (5th Cir. 2008); *Dillard Dep't Stores, Inc. v. Gonzales*, 72 S.W.3d 398, 410 (Tex. App.—El Paso 2002, pet. denied). A constructive discharge occurs when an employer makes conditions so intolerable that an employee reasonably feels compelled to resign. *Davis v. City of Grapevine*, 188

---

[11] In fact, Waste Management's May 5, 2006 letter to Cox's counsel recites that its Lewisville office is closer to Cox's home.

17

S.W.3d 748, 766 (Tex. App.—Fort Worth 2006, pet. denied); *see Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir.), *cert. denied*, 534 U.S. 817 (2001).  The Fifth Circuit has explained,

> In determining whether a reasonable employee would feel compelled to resign, we have considered the relevancy of the following events:
>
> > (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement [or continued employment on terms less favorable than the employee's former status].

*Brown*, 237 F.3d at 566 (alteration in original) (quoting *Barrow v. New Orleans S.S. Ass'n*, 10 F.3d 292, 297 (5th Cir. 1994)); *see also Suders*, 542 U.S. at 134, 124 S. Ct. at 2347 (explaining that to maintain a constructive discharge claim, the plaintiff must "show that the abusive working environment became so intolerable that her resignation qualified as a fitting response").

In his claim that he was constructively discharged, Cox complains about alleged deficiencies in Waste Management's investigation and its ultimate response to his claim.  When asked directly during his deposition why his employment with Waste Management ended, Cox testified, "It was from a doctor that suggested, under the circumstances, for me not to work there

18

anymore, pretty much, on that." He then said that Waste Management "didn't take [him] serious[ly] from the get-go. . . . And they still don't care, you know. . . . And they don't understand exactly what happened. I don't believe it was investigated enough to know exactly what happened. . . . I'm not going to work for somebody that [does not] care."

Although Waste Management's investigation may not have been as thorough, sensitive, or conclusive as Cox desired, the undisputed evidence establishes that Waste Management:

- responded to Cox's complaint within just two days after the complaint surfaced by talking to Cox more than once in person, talking to Wadley separately and then with Cox, and referring Cox to Waste Management's employee assistance program;

- allowed Cox to take short-term paid disability leave for several months following Cox's complaint;

- promptly suspended Wadley without pay for two weeks and placed a written reprimand in his file;

- called Cox to inquire about his return to work, and, at the very least, initially offered him a transfer to Lewisville so that he would not have to work with Wadley; and

- eventually offered to allow Cox to remain working in the Fort Worth location and transfer Wadley from that location.

We cannot conclude that these actions were "calculated to encourage" Cox's resignation. *See Brown*, 237 F.3d at 566; *Davis*, 188 S.W.3d at 766.

19

Cox contends in his brief that Waste Management "did not respond to [his] psychiatrist's statement that [he] could not return to work so long as [Wadley] remained." The psychiatrist, Dr. Germaine Hawkins, had written a letter to Waste Management stating that Cox had suffered significant debilitating stress, was undergoing psychotherapy, and could not return to work "as long as the stressor, his being harassed by [Wadley] continues and/or [Wadley] continues to be employed by your company. [Cox] is very apprehensive . . . of potential future altercations or situations involving that particular supervisor in question." But again, Waste Management's May 5, 2006 letter to Cox's attorney established that Cox would not have to work around Wadley anymore, and the evidence indicates that Wadley did not harass Cox, or even contact him, after Cox's initial report, which was more than four months before Cox's employment ended.

Cox also contends that even Waste Management's personnel agreed that Cox suffered from intolerable working conditions. However, Cox cites portions of the record where such personnel were asked hypothetical questions about whether it would be intolerable for Cox to work for Waste Management if (1) he had to work with Wadley again, (2) Waste Management had taken no action in response to Cox's claim, or (3) Waste Management continued to employ Wadley but transferred Cox. None of the facts underlying the hypothetical

20

questions actually occurred or would have occurred if Cox had responded differently to Waste Management's May 5, 2006 letter.

Finally, we neither agree with nor discount Cox's expressed opinion that Waste Management did not care about him. However, in analyzing a claim of constructive discharge, we must use a reasonable person test and not base our decision on Cox's subjective opinions. *See Potts v. Davis County*, 551 F.3d 1188, 1194 (10th Cir. 2009); *Barrow*, 10 F.3d at 297 & n.19. And the employer's state of mind is also not controlling. *Gonzales*, 72 S.W.3d at 409.

For these reasons, we conclude beyond any genuine issue of material fact and as a matter of law that the conditions of Cox's employment should not have reasonably compelled him to resign. *Davis*, 188 S.W.3d at 766. Thus, because Cox did not suffer any tangible employment action, the trial court properly granted Waste Management's summary judgment motion on his quid pro quo harassment claim. *See La Day*, 302 F.3d at 481–82*; Mason*, 143 S.W.3d at 798.

**Hostile work environment harassment**

For Cox to prove a claim of hostile work environment sexual harassment involving Wadley, he must show that he (1) belonged to a protected group, (2) was subjected to unwelcome sexual harassment, (3) the harassment was based on sex, and (4) the harassment affected a term, condition, or privilege

21

of his employment. *See Lauderdale v. Tex. Dep't of Criminal Justice, Inst. Div.*, 512 F.3d 157, 163 (5th Cir. 2007); *Cancel*, 261 S.W.3d at 784 & n.2; *Garcia*, 967 S.W.2d at 885. In other words, he must prove that Waste Management's workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to create a hostile or abusive working environment to him subjectively and to a reasonable person objectively. *See Garcia*, 967 S.W.2d at 885–86.

Even if Cox provides evidence of a prima facie hostile work environment claim, Waste Management asserted an affirmative defense to that claim. *See City of Waco v. Lopez*, 259 S.W.3d 147, 151 n.3 (Tex. 2008). Because Cox did not suffer any tangible employment action as a result of Wadley's alleged sexual harassment, Waste Management is entitled to its affirmative defense if it "(1) exercised reasonable care to prevent[12] and correct promptly [Wadley's] harassing behavior[,] and (2) [Cox] unreasonably failed to take advantage of any preventive or corrective opportunities provided by [Waste

---

[12] Waste Management has a policy that states in part, "Waste Management is committed to providing a work environment free of unlawful harassment. Company policy prohibits sexual harassment. . . . The Company's anti-harassment policy applies to all persons involved in the operations of the Company." Cox has acknowledged that he received training about the company's sexual harassment policy.

Management] or to avoid harm otherwise." *Id.*; *see Ellerth*, 524 U.S. at 765, 118 S. Ct. at 2270.

Cox asserts that Waste Management did not prove its defense as a matter of law because it did not take appropriate and prompt remedial action, did not advise him of any remedial action taken, and conducted a deficient investigation into his complaint. In *Skidmore v. Precision Printing and Packaging, Inc.*, a company official, Bryan, allowed an alleged harassment victim, Skidmore, to work away from her harasser, Mitchell, but did not conduct any investigation or interview Skidmore's co-workers until after Skidmore filed an Equal Employment Opportunity Commission (EEOC) complaint three months later. 188 F.3d 606, 611 (5th Cir. 1999). Because Skidmore felt ostracized by other employees after making the complaint, she eventually left her employment. *Id.* at 611–12. After Skidmore prevailed in her hostile work environment harassment case against her employer at trial, the Fifth Circuit reversed the trial court's judgment because it held that, as a matter of law, the employer took appropriate remedial action. *Id.* at 612, 616. The Fifth Circuit reasoned,

> This Court has often found that an employer's response to employee behavior constituted prompt remedial action as a matter of law. In many such instances, *in determining whether the employer's actions were remedial, we have considered whether the offending behavior in fact ceased*. In this case, we hold that

23

Precision's [the employer's] conduct constitutes "prompt remedial action" as a matter of law. Bryan testified that he instructed Mitchell to leave Skidmore alone and moved Skidmore to a new shift. At that point, the hostile work environment terminated. Though Skidmore testified that she remained uncomfortable, Mitchell's conduct ceased its offensive nature. Indeed, Skidmore never registered a further complaint with Bryan or any other manager at Precision. Therefore, Precision's action was "reasonably calculated" to relieve, *and in fact did successfully abate*, the hostile work environment, *despite the fact that Bryan did not conduct any investigation of the allegations until after Skidmore filed an EEOC complaint months later*, did not reprimand Mitchell, and made no follow-up inquiry with Skidmore as to whether the harassment had ceased. Thus, . . . the district court erred in failing to grant judgment as a matter of law to Precision.

*Id.* at 616 (citations omitted and emphasis added).

In a similar fashion to Skidmore's argument, Cox has expressed his disagreement with how particular Waste Management officials evaluated the merits of his complaint or how effectively they investigated it. However, there is no dispute that Waste Management suspended Wadley without pay for two weeks after Cox's complaint[13] and notified Wadley that he had violated the company's harassment policy. There is also no dispute that all of Wadley's communication with Cox stopped after Waste Management took that action.[14]

---

[13] Cox does not contend that Waste Management is not entitled to its affirmative defense because Wadley's suspension came too late or because Waste Management's investigation took too long.

[14] Cox cites *Fuller v. City of Oakland, Cal.*, to argue that mere cessation of harassment does not establish an employer's affirmative defense. 47 F.3d 1522, 1528–29 (9th Cir. 1995). But in *Fuller*, the court concluded that the

24

We conclude that those circumstances render the factual disputes about specific officials' investigative actions leading up to Wadley's discipline immaterial. *See Waymire v. Harris County, Tex.*, 86 F.3d 424, 428 (5th Cir. 1996) (explaining that the issue is not whether an investigating official took prompt remedial action, but whether the employer did so); *see also Weger v. City of Ladue*, 500 F.3d 710, 723 (8th Cir. 2007) (holding that the employer was entitled to its affirmative defense despite significant flaws in its investigation); *Baldwin*, 480 F.3d at 1305 (explaining that "even if the process in which an employer arrives at a remedy in the case of alleged sexual harassment is somehow defective, the defense is still available if the remedial result is adequate" because the employment statutes are "concerned with preventing discrimination, not with perfecting process").

Also, although Waste Management did not terminate Wadley's employment in response to Cox's complaint, as Cox might have desired, there is no requirement that the "employer use the most serious sanction available to punish an offender, particularly [upon] . . . the first documented offense." *Waymire*, 86 F.3d at 429. Finally, although Cox claims that Waste

employer failed to take any appropriate remedial steps following the employee's complaint; the same cannot be said here. *Id.* at 1529; *see also Knabe v. Boury Corp.*, 114 F.3d 407, 411 n.8 (3d. Cir. 1997) ("A remedial action that effectively stops the harassment will be deemed adequate as a matter of law.").

25

Management failed to provide him with information about Wadley's suspension, Waste Management's May 5, 2006 letter to Cox's counsel indicated that Waste Management had taken "serious disciplinary action" against Wadley.

For these reasons, we conclude as a matter of law that Waste Management took prompt remedial action in response to Cox's complaint and satisfied the first element of its affirmative defense as a matter of law. Because Cox has not challenged in the substance of his appellate brief whether Waste Management satisfied the second element and because we conclude that Cox failed to take advantage of Waste Management's corrective opportunities by declining to return to work following Waste Management's May 5, 2006 letter, we hold that Waste Management proved its affirmative defense as a matter of law. *See Ellerth*, 524 U.S. at 765, 118 S. Ct. at 2270; *Lopez*, 259 S.W.3d at 152 n.3. Thus, on the basis of the affirmative defense, we hold that the trial court did not err by granting summary judgment for Waste Management on Cox's hostile work environment sexual harassment claim.[15]

---

[15] Because we hold that the trial court properly granted summary judgment on the basis of Waste Management's affirmative defense, we will not address whether the evidence raised a genuine issue of material fact on the prima facie elements of Cox's hostile work environment claim. *See Doe v. Tex. Ass'n of Sch. Bds., Inc.*, 283 S.W.3d 451, 457 n.9 (Tex. App.—Fort Worth 2009, pet. denied).

**Retaliation**

Next, Cox asserts that the trial court erred by granting summary judgment for Waste Management on his retaliation claim. Section 21.055 of the labor code establishes that an employer commits an unlawful employment practice if the employer retaliates or discriminates against a person who files a sexual harassment complaint. *See* Tex. Lab. Code Ann. § 21.055 (Vernon 2006). "The elements of a retaliation claim are (1) the employee engaged in a protected activity, (2) the employer took action against the employee, and (3) a causal connection between the employee's protected activity and the adverse employment decision." *Niu*, 206 S.W.3d at 730; *Herbert v. City of Forest Hill*, 189 S.W.3d 369, 376 (Tex. App.—Fort Worth 2006, no pet.).

At trial and on appeal, Waste Management has contended that it is entitled to summary judgment on Cox's retaliation claim because the evidence establishes as a matter of law that Cox did not suffer from an adverse employment action. An employer's action is an adverse employment action for purposes of a retaliation claim when it is harmful to the point that it could "dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57, 68, 126 S. Ct. 2405, 2409, 2415 (2006); *see Montgomery County v. Park*, 246 S.W.3d 610, 614 (Tex. 2007) (approving of the Supreme Court's

reasoning in *White* as applied to a claim of retaliation under the Texas Whistleblower Act); *Niu*, 206 S.W.3d at 731.

Cox argues that he suffered from an adverse employment action because Waste Management forced his joint meeting with Wadley. Cox testified that the meeting occurred despite his persistent objections and that he told Waste Management officials about Wadley's threats to him before the meeting began. Godoy knew about Cox's anxiety that Wadley caused before the joint meeting occurred. Various Waste Management officials have acknowledged how Cox's exposure to Wadley during the joint meeting could have increased Cox's anxiety and could have intimidated him.

However, Godoy testified that the joint meeting occurred so Waste Management could try to clarify "exactly what was happening" and to see "what had transpired or was transpiring between" Cox and Wadley. He said that he told Cox that the joint meeting was intended to clarify issues and arrive at a potential resolution. Although Waste Management's decision to have a joint meeting with Wadley and Cox may not have been prudent, Cox has not directed us to any evidence in the record indicating that Waste Management had a more sinister motive for the joint meeting.

The purpose of anti-retaliation provisions in employment discrimination statutes is to prevent an employer from interfering "with an employee's efforts

28

to secure or advance enforcement" of such statutes' anti-discrimination provisions. *White,* 548 U.S. at 63, 126 S. Ct. at 2412. Also, one of the stated purposes of chapter twenty-one of the labor code, which contains the anti-retaliation provision at issue, is to "secure for persons in this state . . . freedom from discrimination in certain employment transactions." Tex. Lab. Code Ann. § 21.001(4). Thus, we hold that Waste Management's decision to have a joint meeting with Cox and Wadley—which the evidence indicates was intended to *promote*, not hamper, the investigation of Cox's sexual harassment allegations—cannot as a matter of law serve as an adverse employment action (and thus the basis for Cox's retaliation complaint) even if that meeting was not well advised under the circumstances. *See Brooks v. City of San Mateo*, 229 F.3d 917, 928–29 (9th Cir. 2000) (holding that despite the employer's requiring its employee, the sexual harassment victim, to attend group therapy sessions and discuss the harassment incident with co-workers, an "employer's legitimate effort to deal with a traumatic workplace situation . . . regarding sexual harassment cannot be the basis for a retaliation claim"). In other words, we hold that a procedure that (as far as we can tell from the evidence in the record) was intended to expose facts regarding a claim of sexual harassment, even if it is unpleasant, would not "dissuade a reasonable worker from making

or supporting a charge" of that harassment.  *See White*, 548 U.S. at 57, 68, 126 S. Ct. at 2409, 2415; *Niu*, 206 S.W.3d at 731.

Next, Cox claims that Waste Management's offer to transfer him to its Lewisville office comprises an adverse employment action.  But while Cox states that working in Lewisville would have been substantially *different*, he has not directed us to any evidence showing that working there would have been any *worse*.  Thus, he cannot use the transfer offer to establish an adverse employment action.  *See Scott v. Godwin*, 147 S.W.3d 609, 617 (Tex. App.—Corpus Christi 2004, no pet.) (analyzing a retaliation claim and the requirement of an adverse employment action under another statute and explaining that the employee must show the transfer makes the job objectively worse) (citing *Serna v. City of San Antonio*, 244 F.3d 479, 485 (5th Cir.), *cert. denied*, 534 U.S. 951 (2001)); *see also Sabzevari v. Reliable Life Ins. Co.*, 264 Fed. Appx. 392, 396 (5th Cir.) (stating that "a transfer that does not involve a demotion in form or substance cannot rise to the level of a materially adverse employment action"), *cert. denied*, 129 S. Ct. 111 (2008); *Alvarado v. Tex. Rangers*, 492 F.3d 605, 613 (5th Cir. 2007) (noting that a transfer can be an adverse employment action if "the new position proves objectively worse—such as being less prestigious or less interesting or providing less room for advancement").

30

Because we hold as a matter of law that neither Cox's meeting with Wadley nor Waste Management's transfer offer to Cox can qualify as an adverse employment action, we conclude that the trial court properly granted Waste Management's summary judgment motion as to Cox's retaliation claim. *See Mason*, 143 S.W.3d at 798; *Niu*, 206 S.W.3d at 730.

Having decided that the trial court properly granted Waste Management's traditional summary judgment on all of Cox's claims arising under the labor code, we overrule his first four issues.

**Assault**

In his fifth and eighth issues, Cox asserts that the trial court erred by granting Wadley's and Waste Management's summary judgment motions on his claim that Wadley assaulted him. Wadley asserts that Cox has no evidence to establish any of the elements of this claim; Waste Management contends the same and also asserts that even if Wadley had assaulted Cox, it could not be held vicariously liable for the assault through ratification or other reasons.

The definition of assault is the same in a civil or criminal trial. *Gibbins v. Berlin*, 162 S.W.3d 335, 340 (Tex. App.—Fort Worth 2005, no pet.); *see City of Waco v. Williams*, 209 S.W.3d 216, 223 n.7 (Tex. App.—Waco 2006, pet. denied). Thus, to establish his assault claim, Cox must show that Wadley (1) intentionally, knowingly, or recklessly caused him bodily injury,

31

(2) intentionally or knowingly threatened him with imminent bodily injury, or (3) intentionally or knowingly caused physical contact with him when Wadley knew or should have reasonably believed that he would regard the contact as offensive or provocative. *See* Tex. Penal Code Ann. § 22.01(a) (Vernon Supp. 2009); *City of Waco*, 209 S.W.3d at 223 n.7. A threat is "imminent" when it is a threat of present harm, not future or conditional harm. *Devine v. State*, 786 S.W.2d 268, 270 (Tex. Crim. App. 1989).

Wadley never hit or shoved Cox or took any similar physical action against him; there is no evidence that Wadley ever caused Cox bodily injury. And the record contains only one incident of Wadley touching Cox. Specifically, Cox testified that Wadley once "grabbed" his shoulder for a "few seconds" after a meeting to lead Cox to a company truck and "show [Cox] some map or something." The record indicates that Wadley's giving Cox a map for Cox's route was a normal part of Wadley's supervisory duties. Cox admitted that he "didn't know exactly" what Wadley's intentions were when Wadley touched his shoulder, but he did not think that Wadley was trying to physically hurt him, and he admitted that Wadley's hand did not leave any physical mark and was on his shoulder only "long enough to guide [him] to where [Wadley] was going and then he removed it." Cox never told anyone at Waste Management about the grabbing of his shoulder, and there is nothing in

32

the record indicating that Wadley knew or should have reasonably believed that touching Cox on his shoulder for a few seconds would be offensive or provocative to Cox. As for Wadley's communications with Cox, Cox testified that the only threats that Wadley made were that he would find Cox wherever Cox went and that Cox's expressed happiness made Wadley "want to hurt" him. Neither of these threats are imminent under the standard explained above—at most, they express the potential for future harm.

Under these facts, we conclude that the trial court properly granted Wadley's and Waste Management's summary judgment motions on the ground that the evidence submitted at trial cannot support Cox's assault claim as a matter of law. *See Hamilton*, 249 S.W.3d at 426; *Moore*, 981 S.W.2d at 269. Thus, we overrule Cox's fifth and eighth issues.

**Negligent Retention or Supervision**

In his sixth issue, Cox argues that the trial court erred by granting summary judgment against his claim that Waste Management negligently supervised or retained Wadley. Waste Management has argued at trial and on appeal that Cox's negligent supervision or retention claim is barred by a provision of the labor code pertaining to workers' compensation. Texas courts have explained that section 408.001(a) of the labor code prohibits an employee whose employer carries workers' compensation insurance from maintaining

33

some common law claims, such as some negligence claims, against the employer. *See* Tex. Lab. Code Ann. § 408.001(a) (Vernon 2006); *Fairfield Ins. Co. v. Stephens Martin Paving, LP*, 246 S.W.3d 653, 655 n.1 (Tex. 2008); *Feazell v. Mesa Airlines, Inc.*, 917 S.W.2d 895, 898–99 (Tex. App.—Fort Worth 1996), *writ denied*, 938 S.W.2d 31 (Tex. 1997). Cox's negligent retention and supervision claims are simple negligence causes of action based on Waste Management's alleged direct negligence. *Dangerfield v. Ormsby*, 264 S.W.3d 904, 912 (Tex. App.—Fort Worth 2008, no pet.).

With regard to the effect of section 408.001(a), Cox argues on appeal, for the first time in his reply brief, only that Waste Management did not prove that it carried workers' compensation insurance at the time of his employment; he does not assert any other legal or factual reason why section 408.001(a) does not bar these two claims. However, the evidence submitted by Waste Management (through an affidavit signed by Godoy) establishes that Waste Management carried workers' compensation insurance during Cox's employment and that Cox was covered under the insurance. Also, Godoy testified during his deposition that Cox filed a workers' compensation claim during his absence from work.

Thus, because Cox's sole contention related to the effect of section 408.001(a) is not factually true, we conclude that the trial court's order

34

granting Waste Management's summary judgment motion should be affirmed as to Cox's negligent retention or supervision claims on the basis that the labor code precludes the claims. *See Haire v. Nathan Watson Co.*, 221 S.W.3d 293, 301–02 (Tex. App.—Fort Worth 2007, no pet.) (holding that part of a trial court's summary judgment decision should be affirmed because the appellant did not challenge all of the grounds for the decision on appeal); *Shelton v. Sargent*, 144 S.W.3d 113, 129 (Tex. App.—Fort Worth 2004, pet. denied) (holding the same and noting that "[w]e do not have a duty to perform an independent review of the record and applicable law"); *see also Vawter v. Garvey*, 786 S.W.2d 263, 264 (Tex. 1990) ("A court of appeals may not reverse a trial court's judgment in the absence of properly assigned error."). We overrule Cox's sixth issue.

### Intentional Infliction of Emotional Distress

In his ninth issue, Cox asserts that the trial court erred by "deciding that there were no material fact issues regarding whether Eric Cox was subjected to intentional infliction of emotional distress by Tony Wadley individually." The substance of Cox's briefing on his IIED claim only concerns Wadley's asserted liability for that claim; Cox has not argued in briefing or during oral argument that the trial court's decision to grant Waste Management's summary judgment motion on his IIED claim was improper. However, Cox did not plead

35

an IIED claim against Wadley in the trial court. Instead, Cox asserted in his first amended petition only that Waste Management was "directly liable for intentional infliction of emotional distress upon Eric Cox—not as a derivative cause of action[,] . . . but as a result of Waste Management's own conduct." Thus, because Cox did not plead an IIED claim against Wadley at trial, and because Cox's ninth issue concerns only an alleged IIED claim against Wadley, not Waste Management, we also overrule this issue. *See Via Net v. TIG Ins. Co.*, 211 S.W.3d 310, 313 (Tex. 2006) (stating that "[d]efendants are not required to guess what unpleaded claims might apply and negate them"); *SmithKline Beecham Corp. v. Doe*, 903 S.W.2d 347, 355 (Tex. 1995) (explaining that a summary judgment defendant is only required to "meet the plaintiff's case as pleaded").

## Punitive Damages

Finally, in his seventh issue, Cox asks whether the trial court erred by deciding that he could not recover punitive damages. However, because we have decided that the trial court properly granted summary judgment regarding all of Cox's claims pleaded against both Waste Management and Wadley, we decline to address whether punitive damages could have been awarded on those claims, and we overrule Cox's seventh issue. *See* Tex. R. App. P. 47.1;

36

*Hawkins v. Walker*, 233 S.W.3d 380, 395 n.47 (Tex. App.—Fort Worth 2007, pet. denied).

**Conclusion**

Having overruled all of Cox's issues, we affirm the trial court's orders granting the summary judgment motions of Waste Management and Wadley.

TERRIE LIVINGSTON
JUSTICE

PANEL:  LIVINGSTON, MCCOY, and MEIER, JJ.

DELIVERED:  October 29, 2009